# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JULIA HUFF WALKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **CITY OF HUNTSVILLE,** | ) | |
| **ALABAMA; COMPTON OWENS,** | ) | |
| **individually and in his official** | ) | **Civil Action No. 04-S-2636-NE** |
| **capacity as Chief of Police for the** | ) | |
| **City of Huntsville; RHONDA** | ) | |
| **ROSSER, individually and in her** | ) | |
| **official capacity as Police Officer for** | ) | |
| **the City of Huntsville; and** | ) | |
| **JENNIFER WATKINS, individually** | ) | |
| **and in her official capacity as Police** | ) | |
| **Officer for the City of Huntsville;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This civil rights action, which was removed from state court, arises out of the July 2002 arrest of plaintiff, Julia Huff Walker, and her subsequent prosecution for driving under the influence of a controlled substance.[1]  Plaintiff's amended complaint names as defendants the City of Huntsville, Alabama, the City's former Chief of Police, and two City police officers.[2]  The crux of plaintiff's various claims is that she

---

[1] Doc. no. 19 (Amended Complaint).

[2] *Id.*

was suffering from a brain aneurysm at the time of her arrest and detention in the Huntsville / Madison County Jail, and that defendants' failure to identify that condition and drop charges gives rise to causes of action for violations of various provisions of the United States Constitution, as well as state law claims of negligence, false arrest, outrage, invasion of privacy, assault and/or battery, and malicious prosecution.[3]

The case currently is before the court on defendants' motions for summary judgment and motion to strike.[4]  Upon consideration of the voluminous record and exhaustive briefs of counsel, the court concludes that the motions for summary judgment are due to be granted in part and denied in part as moot, and the motion to strike denied as moot.

## I.  SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 advises that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[3] *Id.*

[4] Doc. no. 63 (City of Huntsville's Motion for Summary Judgment); doc. no. 64 (Compton Owens's Motion for Summary Judgment); doc. no. 65 (Jennifer Watkins's Motion for Summary Judgment); doc. no. 66 (Rhonda Rosser's Motion for Summary Judgment); doc. no. 84 (Motion to Strike).

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[5]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

---

[5] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF RELEVANT FACTS [6]

Plaintiff, Julia Huff Walker, is a resident of Marshall County, Alabama.[7]  On Saturday, July 27, 2002, however, she was in Huntsville, Alabama, visiting a friend.[8] During the course of that visit, which lasted overnight, plaintiff became ill and recalls vomiting.[9]  What happened thereafter is somewhat of a mystery to her, however, because she has no memory of anything that occurred from that point until approximately six weeks later.[10]  Other evidence indicates that, at some time on Sunday, July 28, 2002 — the day after she initially became ill — plaintiff departed her friend's home in her automobile.  At approximately 4:30 p.m. that day, the

---

[6] *Nota bene:* At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party." *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003).  "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id. See also*, *e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

[7] Doc. no. 19, at ¶ 1.

[8] Doc. no. 69 (Defendants' Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶ 1.

[9] *Id*. at ¶ 3.

[10] *Id*. at ¶¶ 2-3.

Huntsville Police Department received a telephone call from an unidentified person who reported that a motorist (later identified to be plaintiff) had collided with a residential mailbox, and subsequently stopped her vehicle in the middle of the intersection of Lee High Drive and Forrest Circle in Huntsville.[11]   A dispatcher forwarded the information to on-duty patrol officers, and requested a responsive investigation.[12]

## A.    Plaintiff's Arrest

Huntsville Police Officer Jennifer Watkins, one of the defendants in this case, was the first responder to arrive on the scene.[13]   It is unclear how long it took Officer Watkins to identify the damaged mailbox, but she immediately saw plaintiff's vehicle, as it was sitting in the middle of the intersection, with the motor still running.[14]   As Officer Watkins walked toward plaintiff's automobile, two neighborhood residents — Ronald Sheaffer, who witnessed the collision, and Kathy Werndli, whose mailbox was struck by plaintiff's vehicle — were also approaching.[15]   According to both Officer Watkins and Ronald Sheaffer, plaintiff was still in the car, slumped over the

---

[11] *Id*. at ¶ 5.

[12] *Id*. at ¶ 15.

[13] *Id*. at ¶¶ 15-16.

[14] *Id*. at ¶¶ 16, 17;  Affidavit of Ronald Sheaffer ("Sheaffer Aff."), at ¶ 4.

[15] Sheaffer Aff., at ¶ 6.

steering wheel.[16]   Officer Watkins testified that as she peered through the driver's-side window, she saw that the transmission still was in "drive."[17]   Officer Watkins walked around the automobile, opened the passenger door, and moved the gear-shift to the "park" position.[18]   Officer Watkins then returned to the driver's side of the vehicle, opened the driver's door, lifted plaintiff's head, and asked her whether she was okay.[19]   Plaintiff apparently uttered something in response to this question, but her exact words were indecipherable to Officer Watkins.[20]

Officer Watkins then ordered plaintiff to exit the vehicle.[21]   According to both Officer Watkins and Kathy Werndli, who was watching from a few feet away, plaintiff became "combative" in response to this order.[22]   Officer Watkins testified that plaintiff was "in a dazed state" and began "swinging her arms around, not wanting to get out of the vehicle."[23]   Faced with this conduct, Officer Watkins forcefully removed plaintiff from the car, performed a leg sweep maneuver to place

---

[16] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 16, 18.

[17] *Id.* at ¶¶ 19-20.

[18] *Id.* at ¶¶ 21-22.

[19] *Id.* at ¶¶ 23-24.

[20] *Id.* at ¶ 25.

[21] *Id.* at ¶ 26.

[22] *Id.* at ¶ 27.

[23] Deposition of Jennifer Watkins ("Watkins Depo."), at 15.  *See also* doc. no. 69, Statement of Undisputed Facts, ¶ 29.

her on the ground, and handcuffed her.[24]  Sheaffer, Werndli, and Officer Watkins all stated that, at this point, plaintiff appeared to either be intoxicated or under the influence of some other substance.[25]  Sheaffer reportedly saw bruises on both of plaintiff's arms and her eyes when she first exited the vehicle.[26]  Officer Watkins testified that plaintiff's "physical appearance consisted of bloodshot eyes; her speech was very slurred; she was — her dialect or words were inaudible."[27]  Likewise, plaintiff's hair was in disarray, and Officer Watkins perceived her as confused.[28]  Indeed, at one point, plaintiff made statements suggesting that she believed she was in her living room, and announced that she needed to get dressed.[29]

Huntsville Police Officer Rhonda Rosser, another defendant in this case, arrived at the scene about the time Officer Watkins was handcuffing plaintiff.[30]  Officer Rosser testified that plaintiff looked "wide-eyed" and "wild."[31]  Officer

---

[24] Doc. no. 69, Statement of Undisputed Facts, ¶ 35; doc. no. 81 (Plaintiff's Brief in Opposition to Summary Judgment), Statement of Additional Undisputed Facts, ¶ 9; Sheaffer Aff., at ¶ 6.

[25] Watkins Depo., at 18; Sheaffer Aff., at ¶ 7; Affidavit of Kathy Werndli ("Werndli Aff."), at ¶ 6.

[26] Sheaffer Aff., at ¶ 6.

[27] Watkins Depo., at 16; doc. no. 69, Statement of Undisputed Facts, ¶ 30.

[28] Watkins Depo., at 16; doc. no. 69, Statement of Undisputed Facts, ¶ 30.

[29] Doc. no. 69, Statement of Undisputed Facts, ¶ 41; Doc. no. 81, Statement of Additional Undisputed Facts, ¶ 11.  Suffice it to say, plaintiff clearly did not understand that she was being arrested.  Doc. no. 81, Statement of Additional Undisputed Facts, ¶ 13.

[30] Doc. no. 69, Statement of Undisputed Facts, ¶ 38.

[31] Id. at ¶¶ 40, 42.

Watkins informed Rosser that plaintiff was under arrest, and then placed plaintiff in a patrol car.[32]   Once inside the patrol car, plaintiff was quiet and no longer combative.[33]

Critically, *none* of the four people at the scene — Sheaffer, Werndli, or Officers Watkins and Rosser — thought that plaintiff was suffering from any acute medical condition, illness, or injury that called for immediate medical treatment; consequently, no ambulance was called.[34]

Officer Watkins later testified that plaintiff's behavior, symptoms, and mannerisms on the date of her arrest were consistent with those of other individuals she had previously arrested on suspicion of driving under the influence of alcohol or drugs ("DUI").[35]   Officer Rosser, for her part, believed that plaintiff was under the influence of narcotics.[36]   In this regard, however, it must be noted that neither Officer Watkins nor Officer Rosser had been trained to distinguish between symptoms of alcohol or drug use, on the one hand, and the symptoms of specific medical conditions, on the other.[37]   According to the third individual defendant in this case,

---

[32] *Id.* at ¶ 43.

[33] *Id.* at ¶ 37.

[34] *Id.* at ¶¶ 52-53; doc. no. 81, Statement of Additional Undisputed Facts, ¶ 16.

[35] Doc. no. 69, Statement of Undisputed Facts, ¶ 32.

[36] *Id.* at ¶¶ 40, 42.

[37] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 17-18, 68.

ex-City of Huntsville Chief of Police Compton Owens, police officers were not provided with a list of symptoms known to be associated with drug overdoses.[38] Officer Watkins did admit awareness that alcohol consumption can lead to conditions requiring immediate medical care, though she did not attribute this knowledge to her training.[39]

Both Officers had been taught how to identify the smell of alcohol on a suspect's breath, how to ask a suspect if they had consumed alcohol, and how to perform field-sobriety tests.[40] In this instance, however, Officer Watkins did not actually ask plaintiff whether she had been drinking, and did not detect the odor of alcohol on her breath.[41] Officer Watkins also did not examine plaintiff's arms for any needle marks, or perform field sobriety tests.[42] Nevertheless, after placing plaintiff in the patrol car, Officer Watkins did retrieve a purse from plaintiff's wrecked vehicle, and a search of the purse turned up some pills or capsules that could not be identified at the scene.[43]

After finishing her investigation at the scene, Officer Watkins transported

---

[38] *Id.* at ¶ 20.

[39] *Id.* at ¶ 22.

[40] *Id.* at ¶¶ 14-15.

[41] *Id.* at ¶¶ 2.

[42] *Id.* at ¶¶ 14, 23.

[43] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 45-47.

plaintiff directly to the Huntsville / Madison County Jail, without pausing to have her evaluated at a hospital.[44]

## B.   Plaintiff's Stay at the Huntsville / Madison County Jail

After arriving at the jail, Officer Watkins completed a written arrest report, turned in the pills found in plaintiff's purse as evidence, and remanded plaintiff to the custody of jail personnel.[45]   At 5:56 p.m. on July 28, 2002, plaintiff was formally booked on charges of DUI and standing / stopping in the roadway. *See* Ala. Code §§ 32-5A-137, 32-5A-191(a)(5).[46]

Approximately seven hours later, at 1:16 a.m. on July 29, 2002, plaintiff (or someone else at the Huntsville / Madison County Jail) completed a standard medical questionnaire regarding plaintiff's health history and status by answering a series of 27 "yes" or "no" questions.[47]   As noted earlier, however, plaintiff has no recollection of what transpired during the course of her confinement, and the signature line at the

---

[44] *Id*. at ¶ 48.

[45] *Id*. at ¶ 54.

[46] *Id*. at ¶¶ 55-56.   *See also* Huntsville Police Department Inmate Log.   The evidentiary submission in this case includes a videotape of the booking.   The video lacks any sound, so review of it was helpful only to the extent that it enabled the court to evaluate plaintiff's demeanor.   The court notes that plaintiff was standing or walking on her own throughout much of the video.   Her gait was not entirely smooth or consistent, but she did not stumble or fall down.   Moreover, plaintiff appears calm, and even assisted the officers in collecting her personal property in preparation for confinement.

[47] *See* doc. no. 69, Statement of Undisputed Facts, ¶ 57.   *See also* Huntsville Police Department Medical Questionnaire for Julia Huff Walker.

end of the questionnaire is blank.  Consequently, it is impossible to determine who recorded the health information or, more fundamentally, how that information was even obtained.  For what it is worth, the answers on the questionnaire indicate that plaintiff was conscious, and had no obvious pain, bleeding, or other symptoms suggesting the need for emergency services.[48]  The answers also indicate that plaintiff was not carrying any medication and, interestingly, that she was not visibly intoxicated or under the influence of drugs.[49]  This final portion of the assessment contrasts sharply with that of Officer Rosser, who reportedly saw plaintiff in a holding cell at some point during July 29, 2002.  While refusing to venture an opinion as to whether plaintiff was still under the apparent influence of narcotics at that time, Officer Rosser characterized plaintiff's behavior as "bouncing off the walls."[50]

> She was — she was talking with something, someone, somewhere, but it wasn't — it wasn't like she was looking at you and talking.  She was just talking when she was going back and forth to the doors.  So I don't know if she was singing, or I don't know what she was doing.  But her mouth was moving.  I could hear her voice, but I didn't know what she was saying.[51]

---

[48] *See* doc. no. 69, Statement of Undisputed Facts, ¶ 58.  *See also* Huntsville Police Department Medical Questionnaire for Julia Huff Walker, ¶¶ 1-3.

[49] *See* Huntsville Police Department Medical Questionnaire for Julia Huff Walker, ¶¶ 6-8, 11.

[50] Doc. no. 81, Statement of Additional Undisputed Facts, ¶ 31; Deposition of Rhonda Rosser ("Rosser Depo."), at 56-57.

[51] Rosser Depo., at 59.

During her deposition, Officer Rosser also recalled being surprised that plaintiff was still in a holding cell so long after her arrest, although she did not elaborate (and was not pressed) on the point.[52]  A Huntsville City Jail directive in effect at the time of plaintiff's confinement specified that detainees who appeared to be under the influence of alcohol or drugs, or who exhibited symptoms of serious medical conditions (*e.g.*, unconsciousness, extreme intoxication or incapacitation, breathing difficulties, convulsions, seizures, apparent hallucinations), were to be housed in "Close Observation Cells" until the Detention Supervisor or Detention Officer in Charge determined that frequent observation was no longer necessary.[53]  In the case of detainees who exhibited such symptoms, the directive mandated denial of admission into the general jail population until a "jail nurse" or other approved health care provider performed an evaluation.[54]

It is not clear whether jail officials formally applied the criteria for extended detention in the Close Observation Cells to plaintiff, but jail records indicate that she was evaluated by a jail nurse around 8:00 a.m. on July 29, 2002.[55]  Because of lax

---

[52] *See* Rosser Depo., at 57 ("And I said to myself, 'Gosh, she's still in here.'").

[53] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 75, 77; Huntsville City Jail Operations Policy on Intoxicated Arrestees, at 1-2.  The directive also required jail staffers to observe these detainees every fifteen minutes, and to make a written notation of each observation.

[54] *See* Huntsville City Jail Operations Policy on Intoxicated Arrestees, at 1-2.

[55] Doc. no. 69, Statement of Undisputed Facts, ¶ 60.

record-keeping and fading memories, the identity of that nurse and the reason for examination of plaintiff is not clear.  It is possible that Linda Swanson — a nurse who was temporarily assigned to work at the Huntsville / Madison County Jail for three months during the summer of 2002 — performed the evaluation, but she has no specific recollection of doing so.[56]  In any event, construed in the light most favorable to plaintiff, a notation on the "Detention Facility Inmate Surveillance Log" strongly suggests that plaintiff's continued presence in the booking area was related to a jail nurse's evaluation of her health status.[57]

Plaintiff was detained in the Huntsville / Madison County Jail for roughly twenty-four hours after her arrest.[58]  With the exception of time spent in the area designated as the "jail court," plaintiff was confined exclusively in the booking cells.[59]

## C.    Plaintiff's Release from Jail and Admission to the Hospital

Plaintiff was released from the Huntsville / Madison County Jail at 4:16 p.m. on July 29, almost twenty-four hours after the telephone call alerting Huntsville

---

[56] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 48, 50, 57.

[57] *See* Detention Facility Inmate Surveillance Log, Entry # 3 ("Nurse checked . . . Walker. . . . Walker will need to be housed in booking till later date.").

[58] *See* doc. no. 69, Statement of Undisputed Facts, ¶ 65; doc. no. 81, Statement of Additional Undisputed Facts, ¶ 35.

[59] Doc. no. 81, Statement of Additional Undisputed Facts, ¶ 25.

Police that a motorist had struck a residential mailbox.  Plaintiff's adult sons, Paul and Mark Cunningham, posted a $700 bond to secure their mother's release.[60] Plaintiff signed her own name to the property release form.[61]

Paul Cunningham "knew that something was wrong" when he first saw his mother.[62]  He testified that "[s]he looked in very bad shape," but that her only complaints were a headache and lack of memory; she refused his attempts to seek medical care.[63]

The other son, Mark Cunningham, characterized his mother's behavior as "slightly incoherent," but he testified that he "assumed, as the police officer said, that she was on something and that maybe she needed to sleep this off."[64]  When asked whether his mother's appearance suggested to him the need for immediate medical attention, Mark Cunningham replied:  "I couldn't say physically.  She was not bleeding or nothing that I knew visual [*sic*], but she looked very bruised.  Other than that, I can't — I'm not a doctor so I can't physically say.  I mean she did look a mess."[65]  Mark Cunningham also testified that his mother had "a certain amount of

---

[60] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 63, 65.

[61] *Id*. at ¶ 66.

[62] Deposition of Paul Cunningham ("P. Cunningham Depo."), at 31.

[63] Cunningham Depo., at 27; *id*. at 29, 31-33.

[64] Deposition of Mark Cunningham ("M. Cunningham Depo."), at 29.

[65] M. Cunningham Depo., at 33.

a dazed look," but "[s]he knew who I was, [and] she knew who my brother was."[66]
Like his brother, Mark Cunningham asked his mother whether she wanted to go to
a hospital, but she declined, and he initially honored her wishes.[67]  He added that, if
he had thought that his mother's life was in danger, he would have taken her to a
hospital regardless of her opposition.[68]  A day later, Paul Cunningham did just that.[69]

　　　After posting bond, plaintiff was driven to Mark Cunningham's house, where
she was observed by family members for approximately twenty-four hours.[70]  When
plaintiff's condition and symptoms did not change during that time, Mark
Cunningham finally decided to take her to the hospital for evaluation.[71]  Plaintiff
evidently voiced some opposition to this, but Paul Cunningham "told her she had to
go."[72]

　　　Plaintiff was admitted to Gadsden Regional Medical Center at approximately
5:05 p.m. on July 30, 2002, and she was initially listed as a non-urgent patient.[73]  Her

---

[66] *Id.* at 32.

[67] *See id.* at 34-35; P. Cunningham Depo., at 31-32.

[68] M. Cunningham Depo., at 35.

[69] P. Cunningham Depo., at 37.

[70] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 71-72; doc. no. 81, Statement of Additional Undisputed Facts, ¶ 39.

[71] P. Cunningham Depo., at 37-38, 40; doc. no. 69, Statement of Undisputed Facts, ¶¶ 72-73.

[72] P. Cunningham Depo., at 37; doc. no. 69, Statement of Undisputed Facts, ¶¶ 74-75, 77.

[73] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 78-79.

chief complaint was neck pain.[74]  Just before 7:00 p.m., plaintiff was examined by Dr. William Tyndall.[75]   Because plaintiff had indications of amnesia, a computed tomography ("CT") scan of her head was ordered.[76]   The CT scan was completed around 7:20 p.m., and it showed that plaintiff was suffering from a cerebral aneurysm that was causing a subarachnoid hemorrhage.[77]   Dr. Tyndall recommended that plaintiff be transferred on an emergency basis to the University of Alabama at Birmingham ("UAB") Medical Center.[78]  Consent to the transfer recommendation was provided at or around 9:10 p.m.[79]   A specialized ambulance, with an on-board physician and nurse, was ordered.[80]   The ambulance departed Gadsden Regional Medical Center at 11:05 p.m., arriving at UAB Medical Center shortly thereafter.[81]

---

[74] *See*, *e.g.*, Emergency Physician Record, at 1.

[75] Doc. no. 69, Statement of Undisputed Facts, ¶ 80.

[76] *Id*. at ¶ 82.  CT scanning — sometimes called "CAT scanning" — is a noninvasive, painless medical test that assists physicians to diagnose and treat medical conditions.  CT imaging uses special x-ray equipment to produce multiple images or pictures of the inside of the body and a computer to join them together in cross-sectional views of the area being studied.  The images can then be examined on a computer monitor or printed.  CT scans of internal organs, bone, soft tissue and blood vessels provide greater clarity than conventional x-ray exams.  *See generally The Merck Manual of Diagnosis & Therapy* ("*The Merck Manual*") 2715-16 (18th ed. 2006).

[77] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 82-83.  According to one source, a "[s]ubarachnoid hemorrhage is sudden bleeding into the subarachnoid space [in the brain].  The most common cause of spontaneous bleeding is a ruptured aneurysm."  *The Merck Manual* 1799.

[78] Doc. no. 69, Statement of Undisputed Facts, ¶ 84.

[79] *Id*. at ¶ 86.

[80] Doc. no. 81, Statement of Additional Undisputed Facts, ¶ 42.

[81] Doc. no. 69, Statement of Undisputed Facts, ¶¶ 87-88.

Plaintiff was subsequently admitted to UAB Medical Center and underwent surgery.[82] Although physicians told plaintiff's family that she might not survive the surgery, it was successful.[83]  Plaintiff remained in the hospital for six nights thereafter.[84]

## D.    The City's Prosecution of Plaintiff

As explained in Part II(B), plaintiff was charged with DUI and standing / stopping in the roadway, two violations of Alabama law.  The parties agree that Officer Rosser had no involvement in plaintiff's prosecution whatsoever, and never even spoke to the City prosecutor handling the case.[85]  Officer Watkins was present at one or more court hearings, but never engaged in conversations with the City prosecutor about whether the charges should be dropped.[86]

Municipal Court records reflect that plaintiff's trial on both charges was first set for September 10, 2002.[87]  That setting was continued until November 19, 2002, following a motion by plaintiff's attorney.[88]  On November 19, plaintiff appeared in Municipal Court, accompanied by one of her sons, Paul Cunningham.[89]  At that time,

---

[82] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 43-44.

[83] *Id*. at ¶ 44.

[84] Doc. no. 69, Statement of Undisputed Facts, ¶ 90.

[85] *Id*. at ¶ 92.

[86] *Id*. at ¶ 91; Watkins Depo., at 41.

[87] Doc. no. 69, Statement of Undisputed Facts, ¶ 93.

[88] *Id*. at ¶ 94.

[89] Affidavit of Paul Cunningham ("P. Cunningham Aff."), ¶ 10.

the City prosecutor moved for a continuance based on the representation that the pills collected from plaintiff's purse had been sent for a chemical analysis, but the toxicology report had not been received.[90]   According to Paul Cunningham, the City requested this continuance despite having already received plaintiff's medical records, which indicated that she was drug-free on July 30, 2002, and was instead suffering from a cerebral aneurysm.[91]   In any event, the Municipal Court granted the motion to continue, and reset the trial for January 28, 2003.[92]   On November 22, 2002, the toxicology report was released:   it showed that the capsules in plaintiff's were simply caffeine pills.[93]

With the issuance of this report, the City's last hope for discovery of tangible evidence that plaintiff was driving under the influence of a substance known to impair mental or physical faculties was, or should have been, dashed.   The City of Huntsville Police Department did have a directive in effect during the time period of plaintiff's confinement in July 2002 that established a procedure for collection, storage, and analysis of body fluids for DUI arrestees, but there is no evidence that any drug or

---

[90] P. Cunningham Aff., at ¶ 10; doc. no. 69, Statement of Undisputed Facts, ¶¶ 95-96.

[91] *See* P. Cunningham Aff., at ¶ 10.

[92] Doc. no. 69, Statement of Undisputed Facts, ¶ 98.

[93] *Id*. at ¶¶ 96-97

-18-

alcohol tests were performed on plaintiff prior to or during her detention.[94]  Even so,

when plaintiff appeared at Municipal Court on January 28, 2003, the City prosecutor

still refused to drop the charges unconditionally.  Instead, he offered to dismiss the

case *only if* plaintiff would sign a release in favor of the City and its officers.  Plaintiff

refused, and the City requested yet another continuance to allow it time to subpoena

Ronald Sheaffer, who witnessed plaintiff's collision with the mailbox.  The

Municipal Court judge apparently balked at this request, and promptly dismissed the

charges.[95]

Plaintiff commenced this lawsuit on July 28, 2004, in the Circuit Court of

Madison County, Alabama.[96]  Defendants jointly removed the case to this court on

September 1, 2004.[97]

### III.  DISCUSSION

Plaintiff asserts both official and personal ("individual") capacity claims

against Chief Compton Owens and uniformed patrol officers Jennifer Watkins and

Rhonda Rosser.[98]  The distinction between such claims was summarized by the

---

[94] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 34, 71; Huntsville Police
Department Written Directive on D.U.I. / Drug Evidence, at 1-2; Watkins Depo., at 46.

[95] *See* P. Cunningham Aff., at ¶ 11.

[96] Doc. no. 1 (Notice of Removal), at 1.

[97] *Id.*

[98] *See* doc. no. 19, Caption.

Supreme Court in *Kentucky v. Graham*, 473 U.S. 159 (1985), as follows:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Id.* at 166 (emphasis in original) (citations, footnotes, and internal quotation marks omitted). Plaintiff has also sued the City of Huntsville as an entity.[99]

Consequently, as suggested in the preceding quotation from *Graham*, plaintiff's official capacity claims are redundant. *See also*, *e.g.*, *McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997) (stating that a suit against a governmental officer in his official capacity is the same as a suit against the governmental entity of which the officer is an agent, and that victory in an official-capacity suit imposes liability on the entity the officer represents) (citations omitted). Accordingly, plaintiff's official capacity claims are due to be dismissed. *See*, *e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal

---

[99] *See id.*

officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond).") (citations omitted).  With these housekeeping matters resolved, the court moves on to analyze the substantive merit of plaintiff's other claims.

Plaintiff's amended complaint contains seven counts, each of which appears to be directed indiscriminately at all defendants.  In Count I, plaintiff alleges violations of the Fourth and Fourteenth Amendments to the United States Constitution.  All of the claims collected in the remaining six counts sound in state law.  That is, Count II alleges negligence arising out of plaintiff's arrest, confinement, and subsequent prosecution; Count III charges all defendants with malicious prosecution; Count IV asserts false imprisonment and unlawful arrest claims; Count V contains claims brought under the auspices of the tort of outrage; Count VI consists of claims for assault and battery; and Count VII lists claims of false-light invasion of privacy.

## A.    **Plaintiff's Federal Claims**

Count I of plaintiff's amended complaint is multifaceted and enigmatic.  In the first sentence, plaintiff alleges that, by arresting her for DUI, Chief Owens and

Officers Watkins and Rosser "unlawfully deprived and/or conspired to deprive Plaintiff of her legal rights [as] guaranteed under the Fourth and Fourteenth Amendment[s] of the United States Constitution."[100]  She goes on to allege that, "[t]hereafter, Defendants wrongfully detained plaintiff for approximately 24 hours without medical [care] or treatment."[101]  Plaintiff blames Officers Watkins and Rosser for this wrongful detention, but she also asserts that "the City [of Huntsville] and Chief Owens failed to properly train its officers and implement proper procedures to respond to persons with illness or injury requiring medical care."[102]

Defendants have (correctly, it seems) interpreted Count I as embodying a Fourth Amendment wrongful arrest claim against Officers Watkins and Rosser, a Fourteenth Amendment denial of medical care (*i.e.*, "intentional indifference to plaintiff's serious medical needs") claim against all defendants, and an intimately related failure to train claim against the City of Huntsville and Chief Owens.  All of these claims are presented through 42 U.S.C. § 1983, a statutory provision that "confers a private federal right of action for damages and injunctive relief against state actors who deprive any citizen or person within the jurisdiction of the United States of 'rights, privileges, or immunities secured by the Constitution and laws.'"

---

[100] Doc. no. 19, ¶ 18.

[101] Doc. no. 19, ¶ 18.

[102] Doc. no. 19, ¶ 20.

*Burnett v. Grattan*, 468 U.S. 42, 44 n.3 (1984) (quoting 42 U.S.C. § 1983). *See also generally Monroe v. Pape*, 365 U.S. 167 (1961).[103]

Defendants have responded by moving for summary judgment. In so moving, Officers Watkins and Rosser specifically raise the defense of qualified immunity. The qualified immunity doctrine protects law enforcement officials from suit "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002). "When a government official seeks summary judgment based on qualified immunity, courts apply a two-step test to determine whether qualified immunity is appropriate." *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007). The "threshold question" is this: "[t]aken in the light most

---

[103] Section 1983 originally was Section 1 of the Civil Rights Act of 1871, but it "was 'modeled' on § 2 of the Civil Rights Act of 1866, . . . and was enacted for the express purpose of 'enforc[ing] the provisions of the Fourteenth Amendment.'" *Mitchum v. Foster*, 407 U.S. 225, 238-39 (1972) (citations omitted). In pertinent part, the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer to that question is "no," in other words, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

Likewise, if the court concludes that no predicate constitutional violation has occurred, there would be no need for further analysis of plaintiff's supervisory liability claims against the City of Huntsville and ex-Chief of Police Compton Owens. *See generally Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred.") (collecting cases); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

With these principles in mind, the court now addresses plaintiff's federal claims.

### 1.    Plaintiff's Fourth Amendment unlawful arrest claim

The Fourth Amendment provides, in part, that "[t]he right of the people to be secure in *their persons*, houses, papers, and effects, against *unreasonable* searches

and *seizures*, shall not be violated."   U.S. Const. amend. IV (1791) (emphasis supplied).   As the emphasized words clearly indicate, the Fourth Amendment protects "persons," not places and things.   *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that "the Fourth Amendment protects people, not places").   *See also United States v. Puglisi*, 723 F.2d 779, 786 (11th Cir. 1984) (observing that the Fourth Amendment "applies to places and things only when people have reasonable privacy or possessory interests in them.").

Furthermore, "[t]his inestimable right of personal security belongs as much to *the citizen on the streets of our cities* as to the homeowner closeted in his study to dispose of his secret affairs."   *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968) (emphasis supplied).   *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979) ("As *Terry . . .* recognized, people are not shorn of all Fourth Amendment protection when they step from their homes on the public sidewalks.   *Nor are they shorn of those interests when they step from the sidewalks into their automobiles*.") (emphasis supplied).   Thus, "whenever a police officer accosts an individual and restrains his freedom to walk [or drive] away, he has 'seized' that person."   *Terry*, 393 U.S. at 16.

Here, Officer Watkins not only restrained plaintiff's freedom to leave the scene of the crash by placing her in handcuffs, she formally arrested her and transported her to the Huntsville / Madison County Jail.   Therefore, plaintiff has clearly established

the first element of an unlawful arrest claim — *i.e.*, she was "seized" within the meaning of the Fourth Amendment.

Even so, as defendants correctly note, "'[s]eizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). *See also*, *e.g.*, *United States v. Sharpe*, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures.") (emphasis in original); *Elkins v. United States*, 364 U.S. 206, 222 (1960) (same). A warrantless arrest on a public street is reasonable and, therefore, lawful if it is supported by probable cause. *See*, *e.g.*, *United States v. Czeck*, 105 F.3d 1235, 1238 (8th Cir. 1997) ("A warrantless arrest in a public place is valid if the arresting officer has probable cause.") (citing, *e.g.*, *United States v. Watson*, 423 U.S. 411, 418 (1976)). *See also Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) ("The Fourth Amendment's guarantee against unreasonable searches and seizures encompasses the right to be free from arrest without probable cause.").

The legal rub often lies in the fact that "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). *See also Illinois v. Gates*, 462 U.S. 213, 232 (1983)

("[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.").  The best that can be said is this:  probable cause to effect an arrest exists if, at the moment the arrest was made, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the person arrested either had committed, or was in the process of committing, an offense.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  *See also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Therefore, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

At the same time, courts must refer to the elements of the charge on which a person was arrested, because the question of "[w]hether a particular set of facts gives rise to probable cause . . . to justify an arrest for a particular crime depends, of course,

on the elements of the crime." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004).

Here, Officer Watkins was dispatched to investigate a report that a motorist had run over a residential mailbox. When Officer Watkins arrived at the scene, she saw plaintiff slumped over the steering wheel of a stationary, but running vehicle positioned in the middle of an intersection.[104] After attempting to converse with plaintiff, it became clear that plaintiff was disoriented, at one point combative, and had slurred speech and bloodshot eyes. Although Officer Watkins did not ask plaintiff whether she had been drinking or was under the influence of drugs, and did not administer field sobriety tests, she did testify that plaintiff's symptoms were consistent with those of individuals she had previously arrested on suspicion of DUI. The two lay witnesses at the scene — one of whom had actually witnessed plaintiff driving the vehicle and colliding with the mailbox — concurred that plaintiff appeared to them to be intoxicated. Officer Rosser, who arrived shortly after plaintiff was placed in handcuffs, believed that plaintiff was under the influence of drugs. Her belief was presumably reinforced after Officer Watkins discovered unidentified pills in plaintiff's purse.

---

[104] At some point, Officer Watkins also identified the mailbox with which plaintiff is alleged to have collided.

Based on all of this information, Officer Watkins arrested plaintiff and charged her with violations of Ala. Code §§ 32-5A-191(a)(5) and 32-5A-137.  Section 32-5A-191(a)(5) makes it a crime for any person to "drive or be in actual physical control of any vehicle while . . . [u]nder the influence of any substance which impairs the mental or physical faculties of such person to a degree which renders him or her incapable of safely driving." Ala. Code § 32-5A-191(a)(5).[105]  Plaintiff does not dispute that her symptoms at the time of her arrest were consistent with alcohol intoxication or a drug-induced impairment, nor does she dispute that, regardless of the underlying reason for her impairment, she was obviously incapable of safely driving.[106]  Rather,

---

[105] Section 32-5A-137, on the other hand, makes it illegal to "[s]top, stand or park a vehicle . . . [wi]ithin an intersection." Ala. Code § 32-5A-137(a)(1)(c).  In her brief opposing summary judgment, plaintiff focuses exclusively on whether Officer Watkins possessed probable cause to arrest her on suspicion of DUI, eschewing any analysis of whether Officer Watkins had probable cause to make an arrest based on the lesser charge of stopping in an intersection.  This omission is arguably significant:  the record clearly establishes that Officer Watkins personally witnessed plaintiff stopped in her vehicle — indeed, slumped over the steering wheel — in an intersection. Under Supreme Court precedent, this information alone provided Officer Watkins with a constitutionally sound basis for the arrest. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). *See also* Ala. Code § 15-10-3 (authorizing police officers to arrest a person without a warrant "if a public offense has been committed . . . in the presence of the officer"); *Hawkins v. Alabama*, 585 So. 2d 154, 156 (Ala. 1991) (holding that, "pursuant to § 15-10-3, an officer may arrest a person without a warrant if a misdemeanor, the violation of a city ordinance, or a threat to breach the peace occurs in his presence").  The court need not rest its holding on this ground, however, for a deeper review of the record confirms that Officer Watkins also possessed probable cause to arrest plaintiff on suspicion of DUI.

[106] Furthermore, plaintiff was "in actual physical control" of her vehicle at the time of her apprehension.  *See, e.g.*, *Adams v. Alabama*, 585 So. 2d 156, 159 n.1 (Ala. Cr. App. 1990) (noting that "a person may be convicted of DUI who is in actual physical control of his vehicle, but not yet driving; even where he is asleep in his parked vehicle"), *rev'd on other grounds*, 585 So. 2d 161

plaintiff contends that Officer Watkins lacked probable cause to arrest her, because the officer did not smell alcohol on plaintiff's breath, did not ask whether plaintiff had been drinking or had ingested drugs, and did not perform field sobriety tests. Plaintiff cites no authority to buttress this argument, and the court has not located any supportive cases.  In fact, it is worth noting that the Seventh Circuit rejected this precise argument in a case with compellingly similar facts.  *See Qian v. Kautz*, 168 F.3d 949 (7th Cir. 1999).

Several months prior to the events giving rise to the lawsuit in *Qian*, the plaintiff was involved in a vehicular accident.  *Qian*, 168 F.3d at 951.  Injuries sustained during that accident left plaintiff with recurrent headaches and dizziness, and he eventually resolved to drive himself to a physician.  *Id*. at 951-52.  On the way to the doctor's office, the plaintiff became tired and dizzy, and soon lost his bearings. *Id*. at 952.  "He wound up in a residential area, where he lost control of his car, struck a wooden planter, drove up the curb, crossed several lawns and driveways, and eventually stopped in the bushes some 100 feet later."  *Id*.  The police officer who arrived shortly thereafter observed that the plaintiff

> had lost control of his car and crashed, that he was hunched over and having difficulty walking, that the inside of his car showed no signs that his body had hit anything during the accident, that he denied being

---

(Ala. 1991).

> injured and showed no physical signs of injury, and that his speech
> seemed slurred.

*Id*. at 954.   Even though the police officer performed no field sobriety tests, he

surmised that the plaintiff was most likely intoxicated and arrested him.  *Id*.  When

it later became apparent that the plaintiff was *not* drunk, but instead suffering from

a subdural hematoma resulting from the injuries he sustained in the vehicular accident

several months earlier, plaintiff sued for wrongful arrest under 42 U.S.C. § 1983.  *Id*.

at 953.  As the plaintiff saw it, the arresting officer's "observations were insufficient

as a matter of law to support a reasonable belief of intoxication because they included

only 'general indicators' of intoxication (*e.g.*, slurred speech, unsteadiness, etc.) and

no 'specific indicators' of intoxication (*e.g.*, smell of alcohol, bloodshot eyes, failed

sobriety tests, etc.)."  *Id*. at 954.   The Seventh Circuit rejected this "novel legal

theory" and concluded that "there is nothing so exacting in the Fourth Amendment's

requirements for the reasonableness of arrests."  *Id*.  Applying the customary test for

probable cause, the Seventh Circuit went on to hold that "the overall setting easily

supports [the officer's] decision to arrest [plaintiff] on the scene."  *Id*.

Although this court recognizes that it is not bound by the Seventh Circuit's

holding in *Qian*, the similarity of the underlying facts and legal issues make the

court's reasoning very persuasive.[107]   This court specifically agrees that it would be

unwise as a matter of constitutional law to mandate that police officers perform

standard diagnostic field tests in *every* instance.   Life is too fluid for such a

requirement.   Law enforcement officers may, consistently with the Fourth

Amendment, rely on their own common sense and experience in determining whether

they possess probable cause to make an arrest for DUI, provided, of course, that all

surrounding circumstances are taken into account.  *See Qian*, 168 F.3d at 954.  *See*

*also Hirsch v. Burke*, 40 F.3d 900, 903 (7th Cir. 1994) (concluding that an officer

---

[107] The court pauses to acknowledge that the Eleventh Circuit has previously distinguished *Qian*.  In *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004), the Eleventh Circuit reviewed the arrest of a motorist who had a serious vehicular collision with a police cruiser.  *Id*. at 1224.  Both the motorist and the police officer claimed that the other had run a red light.  *Id*.  The officers who responded to the scene of the collision claimed they possessed probable cause to arrest the motorist for DUI, citing her bloodshot eyes, slurred speech, and an alleged odor of marijuana emanating either from the motorist herself, or her vehicle.  *Id*. at 1226.  Finding evidence in the record to contradict each and every one of these supportive allegations, *see id*., the Eleventh Circuit reversed the district court's grant of summary judgment to the officers.  In so doing, the three-judge panel rejected reliance on the *Qian* decision because it contained too many factual differences.  *See id*. at 1230. Indeed, while not questioning the *Qian* court's reasoning, the panel outlined five specific points of factual distinction.  *See id*.  The most important distinction for purposes of *this* case was that the plaintiff in *Kingsland*, unlike the plaintiff in *Qian*, had just been involved in an obviously serious collision, and actually informed the arresting officers that she had suffered head injuries.  *See id*. The officers, however, seemed to deliberately ignore this alternative explanation for the plaintiff's outward symptoms, and rushed to conclude that she was under the influence of marijuana without even performing a search of her person or vehicle.  *See id*.  In contrast, here and in *Qian*, the arresting officers dealt with suspects who were involved in very minor, one-car accidents, and who did not (audibly, at least) state that they were injured or offer any alternative explanations for their plight.  *Cf. id.* ("[I]f an officer has no reason to believe that the individual has suffered any trauma to cause these conditions [*i.e.*, bloodshot eyes, dizziness, and slurred speech], then a finding of probable cause for DUI would not be dubious.").  Additionally, in the instant case, two neutral, third-party witnesses also believed that plaintiff was intoxicated.   Suffice it to say, this case is distinguishable from *Kingsland* in the same way that *Kingsland* was distinguishable from *Qian*.

-32-

who failed to perform field sobriety tests *still* had probable cause to arrest someone who later turned out to be in diabetic shock where the person smelled of alcohol, had trouble balancing himself, appeared incoherent, and did not know his name or mention that he was diabetic).

Here, plaintiff's outward symptoms and the surrounding circumstances — *e.g.*, the minor, one-car accident, the pills located in plaintiff's purse, the absence of any obvious indication of serious injuries — would clearly suggest to a reasonable police officer that plaintiff was either intoxicated or under the influence of some other substance.  Indeed, both police officers at the scene and both third-party witnesses were united in this belief.  Therefore, mindful that the Fourth Amendment does not require police "to perform error-free investigations," *Kingsland*, 382 F.3d at 1229 n.10 (internal quotation marks and citation omitted), the court is satisfied that Officer Watkins possessed actual probable cause to arrest plaintiff on suspicion of DUI.

As a consequence of determining that the facts, viewed in the light most favorable to plaintiff, do not establish that her arrest was violative of the Fourth Amendment, there is no need to proceed with further analysis of the Officers' qualified immunity defenses.  The absence of a constitutionally impermissible arrest also sounds the death knell of any purported claim plaintiff might attempt to assert against Chief Owens or the City of Huntsville arising out of her arrest.

-33-

### 2.     Plaintiff's attempted assertion of a Fourth Amendment excessive force claim

A liberal construction of plaintiff's amended complaint reveals no inkling of a Fourth Amendment excessive force claim.  Nevertheless, when responding to defendants' motion for summary judgment, plaintiff argued that her right to be free from the use of excessive force was violated when Officer Watkins used a sweep-kick maneuver to place plaintiff on the ground after she exited her vehicle.[108]

It is well-established that a plaintiff "may not amend her complaint through argument in a brief opposing summary judgment."  *Gilmour v. Gates*, *McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  *See also*, *e.g.*, *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (same).  Thus, the court need not consider this "claim" at all.

In addition, even if plaintiff's amended complaint could be interpreted to encompass an excessive force theory, it would fail on the merits.  The Supreme Court held long ago that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Pivoting off this point, the Eleventh Circuit has repeatedly observed that "'the application of de minimis force, without more, will not

---

[108] Doc. no. 81, at 46-49.

support a claim for excessive force in violation of the Fourth Amendment.'"
*Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (quoting *Nolin v. Isbell*,
207 F.3d 1253, 1257 (11th Cir. 2000)).  In *Durruthy*, for instance, the court held that
it was not unlawful for a police officer to force an arrestee to the ground prior to
handcuffing him, even though such force was arguably unnecessary under the
circumstances. *Durruthy*, 351 F.3d at 1094.  In another case, *Jones v. City of Dothan*,
121 F.3d 1456 (11th Cir. 1997), the Eleventh Circuit held that police officers acted
reasonably in slamming a suspect against a wall and kicking his legs apart prior to
frisking him.  *See id*. at 1460.  Finally, in *Nolin v. Isbell*, *supra*, the court held that
officers applied mere *de minimis* force when they took hold of a suspect's shoulder
and wrist, tossed him against a vehicle a few feet away, put their knees in his back,
and pressed his head against the side of the vehicle.  207 F.3d at 1255.  Although
such treatment may seem a bit extreme to the casual reader, "we are not to view the
matter as judges from the comfort of our chambers, fearful of nothing more
threatening than the occasional paper cut as we read a cold record accounting of what
turned out to be the facts."  *Crosby v. Monroe County*, 394 F.3d 1328, 1333-34 (11th
Cir. 2004) (Carnes, J.).

Instead, "[w]e must see the situation through the eyes of the officer on the
scene who is hampered by incomplete information and forced to make a split-second

decision between action and inaction in circumstances where inaction could prove fatal." *Id.* at 1334. *See also Graham*, 490 U.S. at 396 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are often tense, uncertain, and rapidly evolving — about the amount of force that is necessarily in a particular situation.").

Here, the undisputed testimony — viewed, of course, in the light most favorable to plaintiff — indicates that, after being asked to step out of her vehicle, plaintiff became combative and swung her arms about. Officer Watkins responded by forcefully removing plaintiff from the automobile, and then used a sweep-kick to place plaintiff in a less threatening position, on the ground, next to the vehicle. The testimony indicates that Officer Watkins's hands remained on plaintiff's shoulders during this maneuver, so plaintiff was not placed in a free-fall situation. Once plaintiff was handcuffed, no further forceful contact occurred. There is also no solid evidence that plaintiff was injured by the sweep-kick. While she had multiple bruises when she was released from the Huntsville / Madison County Jail, she does not remember how she sustained them, and at least one witness at the scene of plaintiff's arrest stated that he saw the bruises as soon as plaintiff first exited her automobile — *i.e.*, before the sweep-kick technique was employed.

-36-

Given the totality of these circumstances, and drawing on the cases outlined above, the court concludes that Officer Watkins did not utilize excessive force in apprehending plaintiff.  As with the unlawful arrest claim, the conclusion that no constitutional violation occurred eliminates any need to proceed to the second stage of the qualified immunity analysis, or to confront any claim of supervisory or municipal liability.

### 3.     Plaintiff's Fourteenth Amendment denial of medical care claim

Plaintiff's final federal claim is that defendants violated the United States Constitution by arresting and holding her without provision of appropriate medical care.  Of course, the Constitution does not *expressly* guarantee individuals a right to medical care by governmental entities; instead, such rights have been *inferred* from the Eighth and Fourteenth Amendments.  The seminal case is *Estelle v. Gamble*, 429 U.S. 97 (1976), in which the Supreme Court interpreted the Eighth Amendment's proscription against "cruel and unusual punishments" and, for the first time, held that state governments had an "obligation to provide medical care for those [persons convicted of a crime] whom it is punishing by incarceration."  *Id*. at 103.

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment.  In less serious cases, denial of medical care may result in

pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs[,] or by prison guards in intentionally denying or delaying access to medical care[,] or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Id*. at 103-05 (citations, footnotes, and some internal quotation marks omitted).

However, cases rooted in the Eighth Amendment extend only to prison inmates and persons who have been convicted and sentenced, but not yet transferred to a penitentiary.  *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.").

Even so, a few years after *Estelle*, the Supreme Court determined that the so-called "substantive component" of the Fourteenth Amendment's Due Process Clause required state governments to provide medical care for persons who have been

-38-

involuntarily committed to state institutions, such as facilities for the mentally incompetent. *See Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("When a person is institutionalized [and becomes] wholly dependent on the State . . . a duty to provide certain services and care does exist.").[109]

Later still, in *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983), the Supreme Court hinted that states have a broader "due process obligation to *pretrial detainees* or other persons in [their] care who require medical attention." *Id*. at 244 (emphasis supplied). *See also Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 703 n.5 (11th Cir. 1985) ("[A]s the Court made clear in *City of Revere*, the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner."). In virtually the same breath, however, the Court declined to outline the precise contours of that obligation. *See City of Revere*, 463 U.S. at 244. Thus began a long silence that continues to this day. *See*, *e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 387 n.8 (1989) (noting that the Supreme Court "has never actually determined what degree of culpability must be shown before the particular constitutional deprivation asserted in this case — a denial

---

[109] *Youngberg* observed in *dicta* that the "mere fact that Romeo has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment. Indeed, the state concedes that respondent has a right to adequate food, shelter, clothing, *and medical care*." 457 U.S. at 315 (citation and footnote omitted) (emphasis supplied).

of the due process right to medical care while in detention — is established," but nevertheless declining to reach the issue).

In the absence of any definitive statement from the Supreme Court, the Eleventh Circuit has repeatedly held that

> the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; [that is,] both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's *deliberate indifference* to *serious* medical needs.

*Lancaster v. Monroe County*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (emphasis and bracketed text supplied). *See also*, *e.g.*, *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007) (holding that "the decisional law of both amendments" should be applied interchangeably to claims based on either constitutional provision); *Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988) (same); *Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985) (same).

In sum, the touchstone of liability for denial of medical care to pretrial detainees under the Due Process Clause of the Fourteenth Amendment is "*deliberate* indifference to *serious* medical needs." *Estelle*, 429 U.S. at 104 (emphasis supplied). An initial parsing of this standard reveals that it comprises both objective and subjective components. "'First, the plaintiff must prove an objectively serious

medical need.  Second, the plaintiff must prove that the . . . official acted with deliberate indifference to that need.'" *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (quoting *Brown v. Johnson*, 287 F.3d 1344, 1351 (11th Cir. 2004) (internal quotation marks omitted)).  But, the analysis actually is more complicated than this, because "each of these minima has been more specifically described as encompassing two subsidiary requirements."  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).  "Ultimately, there are thus *four* requirements:  [1] an objectively serious need, [2] an objectively insufficient response to that need, [3] subjective awareness of facts signaling the need, and [4] an actual inference of required action from those facts."  *Id*. (emphasis and bracketed numerals supplied).

The Eleventh Circuit has held that a given medical need is not "serious" unless it is "one that, if left unattended, poses a substantial risk of serious harm."  *Brown*, 387 F.3d at 1351 (internal quotation marks and alteration omitted).  Plaintiff's brain aneurysm surely meets this description, but that is not the end of the inquiry, for the medical need at issue must *also be* "'one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Andujar*, 486 F.3d at 1203 (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted)).  *See also*, *e.g.*, *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994) ("Because Swain was a layperson and

not a physician, we also examine her response and reaction to learning of blood in Hill's underwear to determine if a lay person would easily recognize the necessity for a doctor's attention under those circumstances.") (internal quotation marks omitted), *abrogated in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Johnson v. McNeil*, No. 07-13623, 2008 WL 747610, at * 3 (11th Cir. Mar. 21, 2008) (noting that the medical need must be "so obvious that even a layperson would perceive it").

Plaintiff fails this test because her symptoms were, at worst, ambiguous. Officers Watkins and Rosser, two third-party witnesses, and (for a time, at least) plaintiff's own sons and other family members *all* failed to recognize that she was suffering from a serious medical condition requiring immediate attention, as opposed to simply being under the influence of alcohol or some other substance.

Even when plaintiff's sons finally decided, nearly a full day after her release from jail, that they should transport their mother to a hospital for examination, they had no idea that she was suffering from a brain aneurysm, nor was that immediately obvious to the nurse who triaged plaintiff at Gadsden Regional Medical Center.  It was not until a CT scan of plaintiff's brain had been evaluated that medical professionals determined that plaintiff was in serious need of emergency treatment. Thus, plaintiff has not shown that her medical need was "so obvious that even a lay

person would perceive" the necessity of immediate medical attention.[110]  *Cf. Hill*, 40

F.3d at 1189 ("We do not view as objectively unreasonable and illogical Swain's

considering the blood in Hill's underwear as being a continuation of the

gastrointestinal problems for which she then was medicating him and not speculating

that the blood could have resulted from a new and unsuspected condition, sexual

assault."); *Johnson*, 2008 WL 747610, at * 3 (holding that, because the outward

symptoms associated with an inmate's life-threatening intracerebral hemorrhage

---

[110] The court hastens to note that in reaching this conclusion, it has not overlooked the affidavit of plaintiff's medical expert, a Certified Registered Nurse (Anesthetist) named Walter H. Moreland, Jr.  *See* Affidavit of Walter H. Moreland, Jr. ("Moreland Aff.").  In his affidavit, Nurse Moreland opines that "a reasonable lay person under the facts in this matter should have been aware of the need to have Ms. Walker seen by a doctor and that a substantial risk of serious harm existed if Ms. Walker was not seen by a doctor."  *Id*. at ¶ 9.  Because Nurse Moreland is not a lay person, and was not present during plaintiff's arrest and confinement, his opinion as to whether a lay person should have recognized the need for a doctor is inherently speculative, and the absence of any analytical component in his affidavit makes it extremely conclusory to boot.  Perhaps most problematic, however, is that Nurse Moreland's statement of opinion (which is couched in legal terms) misstates the actual test to be applied.  The question is not whether a lay person *should* have recognized the medical need, but whether a lay person *would* recognize the need.  *See*, *e.g.*, *Andujar*, 486 F.3d at 1203 (requiring the need be "one that is so obvious that even a lay person *would easily recognize the necessity for a doctor's attention*") (internal quotation marks omitted) (emphasis supplied).  The Eleventh Circuit has previously looked to the reaction of actual lay witnesses to assess whether this test is met.  *See Hill*, 40 F.3d at 1187 ("Because Swain was a layperson and not a physician, we also examine her response and reaction to learning of blood in Hill's underwear to determine if a lay person would easily recognize the necessity for a doctor's attention under those circumstances.") (internal quotation marks omitted).  In accordance with that approach, this court has assessed the reactions of the officers on the scene, looked at the affidavits of third-party witnesses, and examined the testimony of plaintiff's own family members, who perceived her in person.  It is clear beyond peradventure that *none* of these witnesses was able to "easily recognize" plaintiff's need for medical attention.  This overwhelming evidence forms the basis for the court's conclusion that plaintiff's medical need, however urgent, was not sufficiently obvious to meet the legal definition of "serious medical need."

"were consistent with his [known] history of abdominal problems and diagnosis of hepatitis C," he could not demonstrate "a condition that meets the legal definition of serious medical need").

Likewise, even assuming that plaintiff could establish an objectively "serious" need (*i.e.*, a need that was so obvious that even a lay person would have recognized it), her claim still must be dismissed because she cannot meet her burden under the subjective portion of the test.  In other words, there is no evidence that Officers Watkins and Rosser possessed "subjective knowledge of a risk of serious harm." *Bozeman*, 422 F.3d at 1272 (*Brown*, 387 F.3d at 135); *Carr v. Tatangelo*, 338 F.3d 1259, 1275 (11th Cir. 2003) ("Implicit in our *Thomas* decision concerning deliberate indifference to serious medical needs is *knowledge* that the medical need exists.") (citing *Thomas v. Town of Davie*, 847 F.2d 771, 772-73 (11th Cir. 1988)).  As the court in *Bozeman* explained, "[d]emonstration of the level of subjective knowledge necessary to impute to the Officers a sufficiently blameworthy state of mind consists of two steps:  the Officers 'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* must also draw the inference." *Bozeman*, 422 F.3d at 1272 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (emphasis supplied).

Viewing the facts in the light most favorable to plaintiff, a reasonable jury

arguably could find that Officers Watkins and Rosser had "subjective awareness of facts signaling the need" for immediate medical care. *Taylor*, 221 F.3d at 1258. That is, they witnessed plaintiff's slurred speech, and noted her physiological and psychological disorientation and apparent inability to communicate. As stated above, however, these symptoms are consistent with intoxication, and multiple lay persons who witnessed plaintiff's behavior on the day of, and the days after, her arrest actually assumed that she was under the influence of alcohol or drugs. By the same token, however, a perspicacious medical professional would know that these same symptoms are also consistent with a subarachnoid hemorrhage attributable to a cerebral aneurysm.[111]   Therefore, Officers Watkins and Rosser arguably were subjectively "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Bozeman*, 422 F.3d at 1272 (internal quotation marks omitted).

Critically, however, there is no evidence that Officers Watkins and Rosser, law enforcement officials who lack any advanced medical training, *drew* "an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258. *See also Farmer*, 511 U.S. at 844 (1994) ("Prison officials charged with deliberate

---

[111] *See*, *e.g.*, Expert Report of Stephen D. Taylor, M.D. ("Taylor Report"), at ¶¶ 3-5 (noting that while plaintiff's symptoms were vague and somewhat atypical, they were nonetheless consistent with the diagnosis).

indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, *or* that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.") (emphasis supplied).

Of course, in practical terms it is impossible for a court or a jury to divine what inferences Officers Watkins and Rosser truly drew from the facts presented. Accordingly, reference must be had to circumstantial evidence. *See Farmer*, 511 U.S. at 840 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious") (internal citation omitted).

As set forth above, the unanimous lay testimony in this case bears out the proposition that the risk to plaintiff was *not obvious* to a lay person.  Although one of plaintiff's sons testified that he "knew that something was wrong" when he first saw his mother at the Huntsville / Madison County Jail,[112] neither he nor his brother believed that the danger was so great as to warrant an immediate trip to a hospital.

---

[112] P. Cunningham Depo., at 31.

Instead, both Paul and Mark Cunningham reacted to their mother's symptoms in the same manner as the law enforcement officials who now are charged with deliberate indifference: that is, they ensured that she was watched closely for another twenty-four hours.

While plaintiff (and indeed, all citizens) may prefer that police officers display heightened sensitivity to facts signifying potential medical emergencies, the Due Process Clause of the Fourteenth Amendment does not demand that. *See Farmer*, 511 U.S. at 843 n.8 ("It is not enough merely to find that a reasonable person would have known, or that the defendant should have known[.]"); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) ("Proof that the defendant should have perceived the risk, but did not, is insufficient.") (citation omitted).

In summary, plaintiff's claim that defendants were deliberately indifferent to her serious medical needs and, thereby, denied her needed medical care must be dismissed for at least two discrete, but interrelated, reasons.[113]  First, plaintiff's subarachnoid hemorrhage does not satisfy the legal definition of the term "serious medical need" because the necessity of a doctor's attention was not so obvious that

---

[113] Defendants raise additional reasons for dismissal.  However, in light of this resolution, the court need not address those arguments.  This also means that the court need not decide the merits of defendants' motion to strike Nurse Moreland's opinion regarding medical causation. *See* doc. no. 84.  Hence, that motion will be denied as moot.

a lay person would easily perceive it.

Second, and relatedly, there is no evidence that Officers Watkins and Rosser actually inferred from the facts within their knowledge that denial of medical care to plaintiff presented a serious risk of harming her.  In other words, no constitutional violation occurred.

Insofar as plaintiff claims that the City of Huntsville and ex-Chief of Police Compton Owens are also liable for failure to train their officers, this holding preempts that theory as well.  *See generally Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred.") (collecting cases); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

### 4.    Denial of medical care *redux*:  plaintiff's spoliation argument

Unable to salvage her denial of medical care claim on the merits, plaintiff asserts that summary judgment should be denied on spoliation grounds.  The term "spoliation" is defined by *Black's Law Dictionary* as "the intentional destruction, mutilation, alteration, or concealment of evidence."  *Id.* at 1437 (8th ed. 2004).  As more fully explained below, plaintiff complains that several potential pieces of

evidence were either not retained or were destroyed during a period of transition of authority over the Huntsville / Madison County Jail from the City of Huntsville to Madison County.  Among these alleged items of evidence are:  (1) a signed copy of plaintiff's medical evaluation questionnaire from her time in jail; (2) a contract between the City of Huntsville and Huntsville Hospital governing the provision of a jail nurse; (3) the identity of the jail nurse who evaluated plaintiff; (4) any written list of the jail nurse's evaluative findings; (5) medical records for other detainees; (6) and plaintiff's other "jail records."[114]

Before examining the circumstances leading to plaintiff's assertion of spoliation, the court pauses to review the relevant legal framework.  Spoliation is viewed as an abuse of the discovery process, and federal law permits courts to impose remedial sanctions for such abuse.  *See*, *e.g.*, *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).  Although the appropriate sanction can be as severe as dismissal of a claim or imposition of a default judgment on the issue of liability, *see id.*, plaintiff here simply asks that the court draw an adverse inference from defendants' alleged failure to preserve the evidence at issue and, accordingly, deny

---

[114] Defendants represent that they have provided plaintiff with all available "jail records," and plaintiff makes no effort to explain what documents are allegedly missing.  Accordingly, the court does not address the claim of spoliation to the extent that it relates to these records.  *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument").

their motions for summary judgment.

"In this circuit 'an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.'" *Penalty Kick Management Ltd. v. Coca-Cola Co.*, 318 F.3d 1284, 1294 (11th Cir. 2003) (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)).

On the other hand, "'[m]ere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Bashir*, 119 F.3d at 931 (quoting *Vick v. Texas Employment Commission*, 514 F.2d 734, 737 (5th Cir. 1975)[115]).

Other than providing these basic ground rules — and further noting that state law may be informative to the extent that it is "wholly consistent with federal spoliation principles," *Flury*, 427 F.3d at 944 — the Eleventh Circuit has not set out a specific formula for assessing the existence or nonexistence of "bad faith." One district court within this Circuit has crafted a test that all parties to this case accept as an accurate statement of the law. Under that test, "spoliation is established when the party seeking sanctions proves that (1) the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and, (3) the evidence

---

[115] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

was crucial to the movant being able to prove its prima facie case or defense." *St. Cyr v. Flying J, Inc.*, No. 3:06-CV-13-33TEM, 2007 WL 1716365, at * 3 (M.D. Fla. June 12, 2007) (quoting *Floreter v. City of Orlando*, No. 6:05-CV-400, 2007 U.S. Dist. LEXIS 9527, at * 15 (M.D. Fla. Feb. 9, 2007)). *See also*, *e.g.*, *Vesta Fire Insurance Corp. v. Milan & Co. Construction*, *Inc.*, 901 So. 2d 84, 94-95 (Ala. 2004) (looking to such factors as the importance of the missing evidence, the culpability of the offending parties, and the availability of alternative sources of information). Below, the court examines plaintiff's suggestion of spoliation with reference to all of these considerations.[116]

To fully understand plaintiff's position, it must be understood that, prior to February 1, 2003, the jail in which she was incarcerated was operated by the City of Huntsville under the general supervisory authority of then-Chief of Police Compton Owens.[117] At some point, however, "[a]n intergovernmental agreement [was reached] between Madison County and the City of Huntsville to transfer daily operations of

---

[116] Because the court has already found plaintiff's denial of medical care claim deficient due to her inability to prove that a lay person would have easily recognized her need for a doctor, and because she also cannot show that Officers Watkins and Rosser were subjectively cognizant of a need for medical attention, special consideration must be given to whether the particular items of evidence at issue would assist plaintiff in establishing these key facts.

[117] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 66, 72. *See also* Deposition of Terri Mearse ("Mearse Depo."), at 6-7.

the Huntsville Municipal Jail to the County."[118]   Pursuant to that agreement, the

County took over operational control of the Huntsville / Madison County Jail,

effective February 1, 2003.[119]   One detention officer who worked at the jail during the

transitional period remarked at her deposition that, "when they merged, there was so

much chaos I don't know where the paperwork or half of the things went."[120]   So, for

example, although one of the nurses who worked at the jail during the City's

management testified that she had been told that there was a contract between the

City of Huntsville and Huntsville Hospital regarding the provision of jail nurses,

neither the City nor counsel for Huntsville Hospital could find any such contract.[121]

Defendants also were unable to find a signed copy of plaintiff's medical evaluation

questionnaire.[122]   According to one knowledgeable City of Huntsville official, this is

because no paper copy of the questionnaire (which was created electronically) was

generated or retained.[123]   On the other hand, the detention officer mentioned above

testified that a hard copy bearing plaintiff's signature should have been created —

---

[118] Deposition of Compton C. Owens, III ("Owens Depo."), at 21-22.

[119] *See*, *e.g.*, Mearse Depo., at 6-7.

[120] *See id*. at 53.

[121] *See* Deposition of Linda Carol Thomas Swanson ("Swanson Depo."), at 64-65; Deposition of Sherry Jackson ("Jackson Depo."), at 82.

[122] *See* Jackson Depo., at 73.

[123] *See id*. at 73-75, 119.

though she made no representation as to having seen a hard copy.[124]

Even assuming that these equivocal bits of testimony are sufficient to carry plaintiff's burden of proving that a jail nurse contract and a signed medical questionnaire existed (a problematic assumption in itself, given that the testimony regarding the contract is in the form of inadmissible hearsay, and, the testimony regarding the signed questionnaire is speculative at best), the court simply cannot understand how either of these documents would meaningfully assist plaintiff in proving her case. The two central failures of plaintiff's denial of medical care claim are that her need for treatment was not easily recognizable to a lay person, and that she cannot show that Officers Watkins and Rosser subjectively perceived a need for emergency treatment. A copy of the contract between the City of Huntsville and Huntsville Hospital would merely prove that there was a formal arrangement whereby a nurse would evaluate detainees — something that is undisputed in any event. Even if the contract outlined the specific duties of the jail nurse, that information would not be in the least bit helpful to a plaintiff who cannot show that a *lay person* would have perceived her need for medical care.[125] The medical questionnaire is perhaps more

---

[124] *See* Swanson Depo., at 46.

[125] Plaintiff argues at one point that the contract would "specify the parties' responsibilities to provide care to inmates and [the] duties of the jail nurse." Doc. no. 81, at 41. But we already know the jail nurse's essential duties, and the entire premise of this lawsuit is that the City and its officials bear primary responsibility for ensuring that detainees with obvious medical needs receive

intriguing, because it contains information regarding the reviewer's perceptions of plaintiff's demeanor and medical status, but plaintiff already has a copy of the completed form.  All plaintiff wants is a copy *signed by her*.  The only proffered reason for this demand is that a signed copy "would affirm that Plaintiff at least saw the medical questionnaire at 1 o'clock in the morning."[126]  Of course, if the questionnaire was crucial evidence, the court might understand the desire to know whether plaintiff had an opportunity to review its contents.  As it turns out, however, the answers to the questions on the form are not supportive of *any* party's position.  While defendants contend that plaintiff appeared intoxicated, the form indicates that she did *not* appear to be under the influence of alcohol or some other substance.  Likewise, while plaintiff contends that she was experiencing an obvious medical emergency, the form indicates that she was conscious and not perceptibly in need of medical care.  In other words, the form is not crucial evidence for either side, and the absence of a hard copy bearing plaintiff's signature is insignificant.

As outlined above, documents that might confirm the identity of the jail nurse who evaluated plaintiff, and any written list of that nurse's evaluative findings are also absent from the evidentiary record in this case.  The court concludes that plaintiff

proper care.  That is a duty imposed by the United States Constitution — one that a contract would not vary or alter in any relevant respect.

[126] Doc. no. 81, at 41.

has failed to carry her burden of proving that either of these types of documents ever existed.

As to documents that might confirm the nurse's identity, it is undisputed that defendants provided plaintiff with the names of two nurses who had performed nursing duties for the City of Huntsville.[127]   It was later realized that one of the nurses, Pat Powers, did not actually perform contract nursing for the City during the relevant time period.[128]   The other nurse, Linda Swanson, did perform contract nursing during the summer of 2002 (when plaintiff was detained), but does not recall seeing plaintiff; indeed, Nurse Swanson could not even remember whether she was on vacation on July 28th and 29th, the precise dates when plaintiff was in the Huntsville / Madison County Jail.[129]   Moreover, Nurse Swanson's testimony reveals that there was no written record of when she or other nurses were on duty, and there is evidently no document that would confirm that she was the actual jail nurse during the period of plaintiff's confinement.[130]   Since there is no evidence that any record of nurses on duty at a given time existed, this court cannot punish defendants for failing to produce such information.  *See*, *e.g.*, *St. Cyr*, 2007 WL 1716365, at * 3 (requiring

---

[127] Doc. no. 81, Statement of Additional Undisputed Facts, ¶¶ 47, 48.

[128] *See id*. at ¶ 47.

[129] *Id*. at ¶¶ 50, 57.

[130] *See* Swanson Depo., at 59-61.  *See also* doc. no. 81, Statement of Additional Undisputed Facts, ¶ 53.

the party seeking sanctions to prove that "the missing evidence existed at one time").

The same conclusion applies to Nurse Swanson's alleged written evaluative findings.  While Nurse Swanson did occasionally create written findings or clinical notes when she evaluated inmates, she expressly stated that there were times when she did not make any written notes.[131]  Since Nurse Swanson does not remember seeing plaintiff, and since the City of Huntsville was unable to locate any nurse's written findings pertaining to plaintiff,[132] it is not at all clear that any such written findings ever existed.  *Cf. Bashir*, 119 F.3d at 932 (noting that "an adverse inference from the missing speed tape is permissible only if the circumstances surrounding its absence indicate bad faith (*e.g.*, tampering)").

The final category of evidence at issue is the medical records of other inmates or detainees housed in the Huntsville / Madison County Jail during the same time period as plaintiff.  In her brief opposing summary judgment, plaintiff makes no effort to explain what she means when she says that she has not been provided with "inmate medical records."  In the absence of any explanation, the court assumes she means the standard medical evaluation forms and any written findings created by a jail nurse pertaining to other inmates.  Even so, plaintiff does not explain what vehicle she used

---

[131] Doc. no. 81, Statement of Additional Undisputed Facts, ¶ 55.

[132] Jackson Depo., at 82-83.

to request these records; nor does she specify whether defendants simply refused to produce the documents, or actually looked for them but could not locate any.  Certain evidence appears to suggest that the City of Huntsville did not look for these documents.[133]  If that is the case, plaintiff should have timely moved to compel production.  Alternatively, if plaintiff believes the records were lost or destroyed, she should have so alleged.  *See Bashir*, 119 F.3d at 932 (stating, as previously noted, that "an adverse inference from the missing speed tape is permissible only if the circumstances surrounding its absence indicate bad faith (*e.g.*, tampering)").  She has done neither.  Accordingly, the court finds no grounds for penalizing defendants as a result of the failure to produce these records.[134]

## B.   Plaintiff's State Law Claims

Plaintiff's amended complaint also contains a number of tort claims that sound in state law.  This does not present any jurisdictional problems because, in cases where a federal district court's jurisdiction is based solely upon the presence of a

---

[133] *See id.* at 82 (explaining that she looked only for medical records pertaining to plaintiff, and not to other inmates).

[134] In any event, the court also concludes that these records would be of little help to plaintiff. Plaintiff's only justification for requesting the records is that they might "possibly show the condition of other inmates [who] were sent to the hospital or not sent and what care they received." Doc. no. 81, at 41.  Needless to say, given the unanimous testimony of multiple lay witnesses that plaintiff appeared intoxicated or under the influence of drugs (or, at the very least, that her symptoms seemed consistent with such a diagnosis), this information would not assist plaintiff in proving her case.  Stated slightly differently, whether other inmates under other circumstances were perceived as exhibiting signs of medical distress is not relevant to whether plaintiff was so perceived.

federal question, the court also possesses the *discretion* to entertain state claims that are so related to the federal causes of action that they form a part of the same case or controversy under Article III of the United States Constitution.   28 U.S.C. § 1367(a).[135]   The district court may, however, decline to exercise supplemental jurisdiction when:

> (1)   the claim raises a novel or complex issue of State law,
>
> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)   the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every

---

[135] In full, this statutory subsection provides that:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now called "supplemental"] state-law claims.

*Id*. at 349-50 (bracketed text supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).   "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent [now supplemental] jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon*, 484 U.S. at 350 n.7.

Here, the court has dismissed all federal claims over which it had original jurisdiction.  The court declines to exercise supplemental jurisdiction over the remaining state law claims, which will most likely deal with complex questions of discretionary function immunity under Alabama law.

A district court has discretion to remand a removed case to state court when all federal law claims have dropped out of the action and only the supplemental state law claims remain.  *Id.* at 357.  Remand is preferable to dismissal of the state law claims, in order to protect the plaintiff from any applicable statutes of limitations on her state law claims, and to save her the expense and time of re-filing her papers in state court. *See id.* at 351-53.  Accordingly, plaintiff's state law claims will be remanded to the

-59-

Circuit Court of Madison County, Alabama.

## IV.  CONCLUSION

For the foregoing reasons, the court finds that all of plaintiff's official capacity claims are due to be dismissed as redundant.   Further, defendants' motions for summary judgment are due to be granted to the extent that they seek judgment as to plaintiff's federal claims.   Having disposed of all federal claims, the court will remand the remaining supplemental state law claims to the Circuit Court of Madison County, Alabama, from whence they were removed.   Accordingly, insofar as defendants' motions for summary judgment also seek judgment as to plaintiff's state law claims, they are due to be denied as moot.   An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 11th day of June, 2008.

_____
United States District Judge